1  STEVEN G. KALAR
   Federal Public Defender
2  Northern District of California
   JOHN PAUL REICHMUTH
3  Assistant Federal Public Defender
   13th Floor Federal Building - Suite 1350N
4  1301 Clay Street
   Oakland, CA 94612
5  Telephone:   (415) 517-8647
   Facsimile:    (510) 637-3507
6  Email:         John_Reichmuth@fd.org

7

8  Counsel for Defendant Sparrow

9

10                 IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

14  UNITED STATES OF AMERICA,            **Case No.:** CR 19–076 HSG

15            Plaintiff,                 **SENTENCING MEMORANDUM ON
                                         BEHALF OF RODNEY SPARROW**
16        v.
                                         **Court:**          Video-Teleconference
17  RODNEY TICANIS SPARROW,              **Hearing Date:**   December 16, 2020
                                         **Hearing Time:**   1:00 p.m.
18            Defendant.

19

20        I.       INTRODUCTION

21

22        Mr. Sparrow is a 39-year-old African-American Marine Corps veteran and widower with no

23  prior police contacts who has sole custody of two young children, one of whom is on the autism

24  spectrum.  Mr. Sparrow also lives with severe obesity, Type II Diabetes, and hypertension.  He has

25  lived a law-abiding and productive life during the several years since he stopped his offense.  He has

26  paid at least $35,000 in restitution voluntarily since this case commenced, and if allowed to remain

27  employed, hopes to continue paying restitution of at least $5,000 per month.  There is no dispute

28  about the Guidelines.  The Total Offense Level is 18; the Criminal History Category is I; and the

1  advisory guidelines range is 27-33 months incarceration. The Probation Officer seeks a variance

2  downward to 18 months from a range of 27-33 months.  The government seeks the low-end but has

3  advised counsel and the Court that victims in this case support a sentence that will allow Mr. Sparrow

4  to continue making substantial restitution payments.  A non-custodial sentence of home-confinement,

5  with a $5,000 per month restitution order, best balances the sentencing factors in this case, given the

6  confluence of family responsibilities, health risks, and extraordinary restitution efforts in this case.

7      **II.     FACTS**

8          **A.  Mr. Sparrow's history and characteristics.**

9      After experiencing a good childhood, Mr. Sparrow served for three years in the Marine Corps,

10 earning an Honorable Discharge. PSR ¶ 45.  He worked hard and had no police contacts in his life.

11 PSR ¶¶ 35-40.  Then, inspired by grandiosity, he defrauded several small businesses over several

12 years.  He then voluntarily terminated his criminal activities.  He had gone into legitimate concrete

13 and construction work for several years when he was approached and interviewed by agents in 2019.

14 When interviewed, he admitted his crimes.  PSR ¶¶ 15-16, 57.

15     Around this same time, his life took a tragic turn.  His life partner Georgina Correia died

16 following surgery in early 2019, and Mr. Sparrow became the sole provider for his two children, aged

17 five and nine years.  PSR ¶ 45.  His older child had developed a seizure disorder as an infant and was

18 diagnosed with autism at the age of four.  That child requires weekly counseling and therapy.  *Id.*

19 Mr. Sparrow also suffers from poor health, namely severe obesity, diabetes, and hypertension.  PSR

20 ¶¶ 48-51.  He lives a very different life than the one he led when he committed these crimes.  He is a

21 dedicated solo parent of a child with special needs.

22     Voluntarily, Mr. Sparrow began paying restitution in this case.  To date, he believes he has paid

23 $40,000 out of a total loss of $298,000.  Docket entries credit seven payments of $5,000 each.

24 Docket nos.  27, 30, 32, 35, 38, 40, 46.  It is possible that one payment has not been docketed, as Mr.

25 Sparrow believes there is a check that has not been cashed.  Another payment is expected in the next

26 week.  This is not merely payment, it is a great deal of work.  He is working incredibly hard in large

27 part so he can pay restitution.  His statement of acceptance also shows genuine remorse and empathy

28 for his victims.  PSR ¶21.  Though it appears that he has significant assets and income, the situation is

more complicated than that.  The income listed in the PSR is the income of his business, in which he

is a 50% partner.  He typically earns a salary of $10,000 per month.  The home has not gone through

probate.  Mr. Sparrow would like to take a home equity line of credit and pay off the restitution in

this case, which will require permission from the Court.

## III.   ARGUMENT

### A.  The Sentencing Factors under 18 U.S.C. § 3553(a).

Prison would be unnecessary and harmful because Mr. Sparrow has remained stable and

extremely productive in the community during the pendency of this case, while prison would expose

him to potentially permanent heath consequences or death and, even if he is not harmed, leave his

family to care for two children who are too young to care for themselves or to be separated from a

parent.  *Id.*  Under federal law, *every day of incarceration must be necessary*.  The Court is familiar

with the directives of *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a).  The

Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and

discretion in arriving at a sentencing determination.  The Court must consider the Guidelines range,

the nature and circumstances of the offense, the history and characteristics of the defendant, and the

need to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. §

3553(a)(1), (a)(4) and (a)(6).  In crafting a sentence that is "sufficient, but not greater than

necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also

consider the need for the sentence imposed:  (A) to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence

to criminal conduct; and (C) to protect the public from further crimes of the defendant.  18 U.S.C. §

3553(a)(2).  Simplifying the calculation in this case is that Mr. Sparrow has a very stable life,

extraordinary family responsibilities, major COVID-19 comorbidities, and a record of extraordinary

restitution payments.

### 1.  The pandemic calls for a variance to home confinement.

If Mr. Sparrow is incarcerated, his odds of contracting COVID-19 within prison may or may

not be greater than his odds of contracting it outside of prison on the mainland.  Prior to the dramatic

1    winter surge, the COVID-19 infection rate within prison generally, and BOP facilities specifically,

2    far outpaced the infection rate in the United States.  A research letter in the Journal of the American

3    Medical Association ("JAMA") found the COVID-19 case rate for prisoners of 3,251 per 100,000

4    prisoners was 5.5 times higher than the U.S. population case rate of 587 per 100,000. Saloner, et al.,

5    "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, Jul. 8, 2020,

6    https://jamanetwork.com/journals/jama/fullarticle/2768249.  But Mr. Sparrow resides in Hawaii,

7    which has the lowest infection rate of any state, with less than one-third of the daily case rate of

8    Vermont, the state with the second-lowest daily case rate, and approximately one-twentieth of the

9    most-affected state, Rhode Island.  CDC Covid Data Tracker, December 8, 2020,

10   https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days.  There is no BOP prison in

11   Hawaii.  The Federal Detention Center in Honolulu is for pretrial detainees and those serving very

12   short sentences. https://en.wikipedia.org/wiki/Federal_Detention_Center,_Honolulu.  It seems

13   substantially likely that any prison sentence would land Mr. Sparrow in a place where infection rates

14   are much higher than he faces now.

15          It is not a given that prisons now have the pandemic under control.  Even in BOP facilities that

16   have weathered a significant outbreak, a high risk remains.  In the civil case *Wilson v. Ponce*, CV 20-

17   4451-MWF-PVC (C.D.Cal. 2020), a neutral expert assessed conditions at Terminal Island following

18   a large COVID-19 outbreak there.  The report, filed in the action by the government, was authored by

19   former San Quentin Chief Surgeon and Physician Michael Rowe, M.D. *Report on Current*

20   *Management and Future Risks Associated with Covid-19 Infection at FCI Terminal Island*, filed

21   August 24, 2020, available at https://prisonlaw.com/wp-content/uploads/2020/08/ECF-74-1-Report-

22   of-Dr.-Michael-Rowe.pdf .   The report finds:

23

24   •   "Having gone through the massive outbreak in April and May, now there is almost no active
         virus in the institution other than two individuals in isolation . . . .  It currently gives the

25       appearance of calm where, no doubt, there was organizational frenzy just a few months ago . .
         . . Despite this, huge risks remain . . . .  [T]he potential for a devastating return of the outbreak

26       remains." *Id.* at 11.

27   •   "The prison remains and will remain constantly teetering on the brink of a recurrent outbreak,
         as with so many communities and institutions." *Id.* at 5.

28

SPARROW SENTENCING MEMORANDUM
*SPARROW*, CR 19–076 HSG

- "Should the virus be introduced into the cohorted 'negative' housing units as currently configured, it is likely that the infection would sweep through these units before anyone even became symptomatic and testing could be accomplished." *Id.* at 14.

- "Social distancing is functionally impossible in the current dormitory configuration." *Id.* at 20.

- "[E]very individual moved to a safer setting would benefit . . . ." *Id.* at 33.

Even in a system that has learned a great deal, Mr. Sparrow will very likely be exposed if incarcerated.  He should be maintained in a safer setting:  home confinement in Hawaii.

Even if the odds of contracting COVID are not greater in custody, the outcomes may be much worse.  The adjusted death rate from COVID-19 for inmates was recently three times higher than would be expected if age and sex distributions of the U.S. and prison population were equal.  Saloner, et al.  Significantly, a new preprint, not yet peer-reviewed, finds that even when people are taken from prison to a local hospital system with COVID-19, *they fare much worse than patients from the community*.  A study at the Henry Ford Health System in Michigan reported:

> Of the 706 hospitalized Covid-19 patients (mean age 66.7 +/- 16.1 years, 57% males, and 44% black), 108 were prisoners and 598 were non-prisoners.  Compared to non-prisoners, prisoners were more likely to present with fever, tachypnea, hypoxemia, and markedly elevated inflammatory markers.  Prisoners were more commonly admitted to the intensive care unit (ICU) (26.9% vs. 18.7%), required vasopressors (24.1% vs. 9.9%), and intubated (25.0% vs. 15.2%).  Prisoners had higher unadjusted inpatient mortality (29.6% vs. 20.1%) and 30-day mortality (34.3% vs. 24.6%).  In the adjusted models, prisoner status was associated with higher in-hospital death (odds ratio, 1.95; 95% confidence interval (CI), 1.07 to 3.57) and 30-day mortality (hazard ratio, 1.92; 95% CI, 1.24 to 2.98).

Altibi, et al., *Comparative Clinical Outcomes and Mortality in Prisoner and Non-Prisoner Populations Hospitalized with COVID-19: A Cohort from Michigan*, medRxiv, https://www.medrxiv.org/content/10.1101/2020.08.08.20170787v1 .  A COVID-19 diagnosis, especially for Mr. Sparrow, will likely have a much worse course if he becomes infected in prison as opposed to while on home detention.

The risk of severe COVID-19 is profoundly aggravated by Mr. Sparrow's poor health.  Of greatest concern, Mr. Sparrow suffers from obesity.  The PSR lists him as 6-foot-2 and 315 pounds, which yields a BMI of 40.42.   There are three classes of obesity, ranked from least to most severe:

Class I (BMI = 30.0 to 34.9), Class II (BMI 35-39.9), and Class III, or "severe" (BMI 40+).[1]  Mr. Sparrow's BMI represents severe, or morbid, obesity.  The CDC lists "severe obesity" as putting individuals "at increased risk of severe illness from COVID-19."  Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *People with Certain Medical Conditions* ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  The CDC finds that conclusion supported by the "strongest and most consistent evidence," citing six studies.  Indeed, one study of 4,103 patients in New York City found that the "two most important features" predicting hospitalization were obesity and age.  A very recent accepted and peer-reviewed observational study concludes that obesity doubled mortality rates in patients admitted to French hospitals.  Czernichow, et al, *Obesity doubles mortality in patients hospitalized for SARS-CoV-2 in Paris hospitals, France: a cohort study on 5795 patients*, Obesity: A Research Journal, available at https://doi.org/10.1002/oby.23014.

Courts have found that obesity alone is a sufficient justification for granting compassionate release motions, even in the absence of other high-risk medical conditions. *See, e.g., United States v. Williams,* No. 19-cr-134 (D. Md. Jun. 10, 2020); *United States v. Anderson*, No. 16-CR-824-1 (S.D.N.Y. Jun. 2, 2020).  Mr. Sparrow's weight—over which he would have little control in custody given his probable inability to exercise due to lockdowns in prison—presents a threat to his life in a pandemic-stricken prison.

Moreover, Mr. Sparrow has Type II diabetes, recognized by the CDC as falling in the "at increased risk" of severe illness category.  CDC.  As with obesity, this is the highest risk category recognized by CDC.  Additionally, Mr. Sparrow has hypertension, another underlying medical condition that the CDC reports "might" increase the risk of severe illness from COVID-19.  CDC.

COVID in jails and prisons is not greeted with the same alarm with which it was approached in the Spring.  This may be due to a number of factors, including COVID fatigue, and greater incidence in the community.  But another reason may be that people like Mr. Sparrow have been removed from,

[1] *Defining Adult Overweight and Obesity,* CDC ONLINE (June 30, 2020), available at https://www.cdc.gov/obesity/adult/defining.html (last visited July 9, 2020).

and diverted away from, prison by the thousands.  Public health is difficult because casualties are noticed, but lives saved are hard to see.  It is a virtual certainty that the courts have saved thousands of lives by following CDC guidance and not placing people with obesity, diabetes, and hypertension in confinement where COVID has thrived.  Court should continue this practice until the pandemic is under control.

Additionally, even if Mr. Sparrow were to avoid severe COVID in prison, the sentence requested by Probation would be very severe, given the lack of movement, visiting, exercise, or programing caused by the pandemic.  This is especially difficult for someone in very ill health.  Other district courts have recently cited the harsh prison conditions and lack of programming opportunities due to the coronavirus as reasons to vary downward in imposing sentence.  *See e.g.*, *United States v. William White*, 19-cr-325-RC (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail due to COVID-19); *United States v. Antonio Cox*, 19-cr-235-JDB (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19).

And there is no guarantee that Mr. Sparrow would be designated to the Federal Detention Center in Hawaii, which is primarily for pretrial detainees and those serving short sentences.  He thus might spend a prison sentence thousands of miles from his children.  Because of heightened severity, risks, and costs (including risks to staff) during the pandemic, the prison remedy during COVID-19 should be reserved for confinement sentences that are truly necessary.

This is not such a case.  Mr. Sparrow is the type of defendant routinely considered for compassionate release.  Incarcerating him during the pandemic is unnecessary and impractical, and it could easily exceed the Court's intended sanction due to factors beyond the Court's control, such as infection rates or designation far from Hawaii.

## 2.  Mr. Sparrow's extraordinary family responsibilities call for a variance and alternatives to incarceration.

Before and after *Booker*, whether characterized as a guidelines departure or section 3553(a) variance, courts have long recognized that a defendant's family pays a high price when the court imposes a prison sentence.  This common-sense approach to sentencing affirms the public interest in

holding a defendant accountable for his conduct while acknowledging the correlative public interest in minimizing harm to family members who will be affected by his incarceration.  *See generally*, Hagan & Dinovitzer, *Collateral Consequences of Imprisonment for Children, Communities and Prisoners*, 26 Crime & Justice 121 (1999).  Mindful of such collateral consequences, courts have not hesitated to impose non-guidelines sentences based on family circumstances.  *See, e.g., United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (where guidelines range was 41 to 51 months, imposition of sentence of probation affirmed in part due to close relationship of father and child); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (where guidelines range was 37 to 46 months, imposition of 270 days home confinement affirmed based on family circumstances); *United States v. Galante*, 111 F.3d 1029 (2nd Cir. 1997) (affirming 13-level departure in drug case from 46-57 months to 8 days where defendant showed he was a conscientious and caring father of two young sons who would have faced severe financial hardships).  Extraordinary collateral consequences of incarceration on minor children are a significant and recognized basis for sentence reduction.

And just as Mr. Sparrow's health conditions would raise the issue of compassionate release if Mr. Sparrow had already been incarcerated, so would the death of his partner and co-parent of two minor children.  This precise family circumstance has been explicitly recognized by the U.S. Sentencing Guidelines as the type of "extraordinary and compelling reason" under 18 U.S.C. § 3582(c)(1)(A) that can serve as the basis for compassionate release.  *See* U.S.S.G. § 1B1.13 (app. n.1(D)) ("The death or incapacitation of the caregiver of the defendant's minor child or minor children.").

A prison sentence would have major consequences for the children in this case, who would experience a sudden loss of a parent, less than two years after the death of their mother, during a time of already great disruption and stress.  This is an independent extraordinary and compelling reason for a non-custodial sentence here.

### 3.  Mr. Sparrow's extraordinary restitution calls for a variance.

Voluntarily, Mr. Sparrow began paying restitution in this case.  To date, he believes he has paid $40,000 out of a total loss of $298,000.  Docket nos.  27, 30, 32, 35, 38, 40, 46.  In determining the

appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7); *see also, e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Peterson*, 363 F.Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting variance so that defendant could work and pay restitution). In this case, unlike many others, there would be a significant likelihood of full restitution if Mr. Sparrow were permitted to remain working at his current position. This is what the victims in this case request and it is more helpful to them than prison, because it is not certain that the employment and economic circumstances that exist now will be the same when a prison term would end.

The sentencing factors favor home confinement in this case. As Mr. Sparrow's turnaround prior to this arrest, and his voluntary restitution have shown, Mr. Sparrow is not likely to recidivate, so community protection and specific deterrence do not require prison. Given the grave risks of incarceration and the family separation aspect of this case, respect for the law will not be furthered by incarceration, either. Nor would parity be advanced by putting into prison the type of inmate who should naturally be assessed for compassionate release. Finally, deterrence of others would not be compromised by home confinement in this case: the factors present in this case are unique, as is the international health crisis, and the consequences remain significant, even without prison. Years after his offenses, Mr. Sparrow, a veteran with no priors, was caught and federally prosecuted; he will be sanctioned with his first felony and stripped of any ill-gotten gains.

If the Court imposes probation, he will still serve a lengthy term of home confinement. The sentencing factors clearly militate for community confinement.

1

## IV.   CONCLUSION

2

Based on the foregoing, the defense respectfully requests that Mr. Sparrow sentenced to a

3

lengthy probation sentence with a significant home confinement term and a $5,000-per-month

4

minimum restitution payment included.

5

6

7    Dated:      December 9, 2020                    Respectfully submitted,

8

9                                                    STEVEN G. KALAR
                                                     Federal Public Defender
10                                                   Northern District of California

11                                                              /S
12                                                   JOHN PAUL REICHMUTH
                                                     Assistant Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28